UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------x
In re:

PUERTO RICO PUBLIC FINANCE                    PROMESA
CORPORATION,                                  Title VI

              Applicant.                    Case No. 22-cv-1517 (LTS)
-------------------------------------------------------------x

OPINION AND ORDER CONCERNING THE ISSUANCE OF GDB DEBT
RECOVERY AUTHORITY BONDS IN CONNECTION WITH THE QUALIFYING
MODIFICATION OF THE PUERTO RICO PUBLIC FINANCE CORPORATION

APPEARANCES:

C. CONDE & ASSOC. LAW OFFICE
By:     Carmen D. Conde Torres
        Luisa S. Valle Castro
254 San José Street, Suite 5
San Juan, PR 00901-1523

DAVIS POLK & WARDELL LLP
By:     Benjamin S. Kaminetzky
        Brian M. Resnick
        Marc M. Resnick
        Stephanie Massman
450 Lexington Avenue
New York, New York 10017

*Attorneys for Cantor-Katz Collateral
Monitor LLC, as Collateral Monitor
for DRA Bondholders*

MCCONNELL VALDÉS LLC
By:     Arturo J. García Solá
        Nayuan Zouairabani
270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
P.O. Box 364225
San Juan, PR 00936-4225

*Attorneys for AmeriNational
Community Services, LLC, as
Servicer for the GDB Debt
Recovery Authority*

TORO COLÓN MULLET P.S.C.
By:     Nayda I. Perez-Roman
P.O. Box 195383
San Juan, Puerto Rico 00919-5383

LOWENSTEIN SANDLER LLP
By:     Andrew Behlmann
        Michael Papandrea
One Lowenstein Drive
Roseland, New Jersey 07068

*Counsel to Fir Tree Capital
Management LP*

O'NEILL & BORGES LLC
By:     Hermann D. Bauer
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813

PROSKAUER ROSE LLP
By:     Brian S. Rosen
        Steve Y. Ma
        Libbie B. Osaben
Eleven Times Square
New York, NY 10036

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico as
Administrative Supervisor for PFC*

TORO COLÓN MULLET P.S.C.
By:     Manuel Fernández-Bared
        Linette Figueroa-Torres
        Nayda Perez-Roman
P.O. Box 195383
San Juan, Puerto Rico 00919-5383

KRAMER LEVIN NAFTALIS &
FRANKEL LLP
By:     Douglas Buckley
1177 Avenue of the Americas
New York, New York 10036

*Counsel for the Invesco Funds*

CANCIO COVAS & SANTIAGO, LLP
By:     Charles E. Vilaró Valderrábano
MCS Plaza, Suite A-267
255 Ave. Ponce de León
San Juan, Puerto Rico 00917

KING & SPALDING LLP
By:     Scott I. Davidson
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100

*Attorneys for GDB Debt
Recovery Authority*

RIVERA, TULLA AND FERRER, LLC
By:     Eric A. Tulla
Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212

HOGAN LOVELLS US LLP
By:     Ronald J. Silverman
         Pieter Van Tol
         Sara M. Posner
         Katherine M. Lynn
390 Madison Avenue
New York, NY 10017

*Counsel to U.S. Bank Trust
National Association and
U.S. Bank National
Association, as Trustee*

PIETRANTONI MENDEZ &
ALVAREZ LLC
By:     Oreste R. Ramos
         María D. Trelles-Hernández
         María Elena Martínez Casado
Popular Center 19th Floor
208 Ponce de Leon Ave.
San Juan, PR 00918

O'MELVENY & MYERS LLP
By:     Peter Friedman
1625 Eye Street, NW
Washington, DC 20006

         *and*

By:     Matthew P. Kremer
7 Times Square
New York, NY 10036

*Attorneys for the Puerto
Rico Fiscal Agency and
Financial Advisory Authority*

LAURA TAYLOR SWAIN, United States District Judge

On October 28, 2022, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as Administrative Supervisor for the Puerto Rico Public Finance Corporation ("PFC"), filed the *Application of the Puerto Rico Public Finance Corporation, By and Through the Financial Oversight and Management Board for Puerto Rico, as Administrative Supervisor, for Approval of the Qualifying Modification for PFC Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act* (Docket Entry No. 1) (the "Application"),[1] pursuant to which it requested approval of a qualifying modification for PFC (the "PFC Qualifying Modification") pursuant to Title VI of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2101 et seq. On December 1, 2022, the Court approved the *Joint Stipulation and Order Regarding (A) the Qualifying Modification Pursuant to PROMESA Title VI for the Puerto Rico Public Finance Corporation and (B) Briefing and Hearing with Respect to the Issuance of DRA Bonds* (Docket Entry No. 32) (the "Stipulation"), which bifurcated consideration of the application for approval of the PFC Qualifying Modification from the parties' dispute concerning whether the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") and the Government Development Bank for Puerto Rico ("GDB") have the right to direct the GDB Debt Recovery Authority to issue bonds (the "Additional DRA Bonds") on account of certain obligations as contemplated by the Application and the PFC Qualifying Modification (the "Proposed Bond Issuance").

---

[1]     All docket references herein are to entries in Case No. 22-cv-01517 unless otherwise indicated.

Consistent with the Stipulation, several parties filed briefs in support of or in opposition to the Proposed Bond Issuance.[2]  The Court has reviewed the briefing and listened carefully to the arguments of counsel at the hearing on May 10, 2023 (the "Hearing").  The Court has subject matter jurisdiction of this proceeding pursuant to 48 U.S.C. § 2126(a) and 48 U.S.C. § 2231(m)(1)(D).

For reasons that follow, the Court hereby recognizes the authority of AAFAF and GDB to direct the DRA to issue the Additional DRA Bonds and that the DRA is obligated to issue those bonds (subject to the cap set forth in the Bond Indenture and Master Transfer Agreement, as those terms are defined herein).

## I.

### BACKGROUND[3]

GDB was established as a governmental instrumentality "[t]o aid the

---

[2]     A memorandum of law in opposition to the Proposed Bond Issuance was filed by AmeriNational Community Services, LLC (the "Servicer"), in its capacity as servicer of the collateral securing the DRA Bonds and Cantor-Katz Collateral Monitor LLC (the "Collateral Monitor" and, collectively with the Servicer, the "DRA Parties"), in its capacity as collateral monitor for the holders of the DRA Bonds  (Docket Entry No. 61) (the "DRA Parties' Brief").  Memoranda of law in support of the Proposed Bond Issuance were filed by U.S. Bank Trust National Association and U.S. Bank National Association (collectively, "U.S. Bank"), solely in its capacity as Trustee under the Trust Agreement between PFC and U.S. Bank dated as of June 1, 2004 (Docket Entry No. 82) (the "U.S. Bank Br."), Invesco Advisers, Inc. ("Invesco") (Docket Entry No. 83), AAFAF and the Oversight Board (Docket Entry No. 84), and Fir Tree Capital Management LP ("Fir Tree" and, together with U.S. Bank, Invesco, AAFAF, and the Oversight Board, the "Supporting Parties") (Docket Entry No. 85) (the "Fir Tree Brief").

[3]     The following facts are undisputed, except as otherwise indicated.  The Court declines to address assertions proffered by the parties that are immaterial and conclusory statements of law which the parties proffer as facts.  Citations to the "Kaminetzky Declaration" (and exhibits thereto) reference the declaration of Benjamin S. Kaminetzky (Docket Entry No.

Commonwealth Government in the performance of its fiscal duties and more effectively to carry out its governmental responsibility to develop the economy of Puerto Rico."  7 L.P.R.A. § 551. In August 2011, December 2011, and June 2012, GDB issued stand-by letters of credit in favor of U.S. Bank, as indenture trustee for certain bonds issued by PFC (the "PFC Bond Trustee"). (See Kaminetzky Exs. D, E, F (the "Stand-By LOCs").)  Each of the Stand-By LOCs provided that the PFC Bond Trustee could draw certain amounts in the event that certain conditions were met.  (Id.)

In 2018, GDB and certain holders of GDB bonds entered into the *Restructuring Support Agreement*, dated August 3, 2018.  (Kaminetzky Ex. G (the "GDB RSA").)  The GDB RSA contemplated a restructuring of certain of GDB's debt obligations pursuant to Title VI of PROMESA.  Attached to the GDB RSA as Exhibit A was a document titled *Outline of Transaction Structure for Restructuring of GDB Liabilities* (the "Term Sheet"), which set out certain terms for a proposed transaction pursuant to Title VI.  (Id.)  However, section 7 of the GDB RSA provided that those terms would be replaced upon the finalization of the "Definitive Documents" governing the transaction:

> Upon written confirmation of an agreement (which confirmation may be by email) among the GDB Parties and the Requisite Bondholders on, and finalization of, the Definitive Documents, this RSA shall automatically be deemed amended to replace the Restructuring Term Sheet with the Definitive Documents as Exhibit A hereto and all references in this Agreement to the Restructuring Term Sheet shall be deemed to be references to the Definitive Documents, as applicable.

(GDB RSA at 18; see also Term Sheet at 1 ("Except to the extent provided in the RSA or any Qualifying RSA, this Term Sheet does not constitute a commitment by any party and in any

---

61-1), and references to the "Behlmann Declaration" (and exhibits thereto) reference the declaration of Andrew Behlmann (Docket Entry No. 85-1).

event is subject to the terms and conditions hereof, including, without limitation, requisite approvals under Title VI of PROMESA and execution and delivery of definitive agreements . . . .").)

Schedule 2 of the Term Sheet—titled "Contingent and Unliquidated Title VI Bond Claims"—listed "PR Public Finance Corporation Stand-By Letter of Credit," explaining, in a footnote, that the claim "[r]epresents a stand-by letter of credit . . . for the benefit of Puerto Rico Public Finance Corporation 2011 Series A and B Bonds and 2012 Series A Bonds" and that the PFC Bond Trustee was only permitted to draw on the Stand-By LOCs under certain conditions. As to the contemplated treatment of such claims in GDB's qualifying modification, a footnote in the Term Sheet stated as follows:

> No New Bonds will be issued at closing in respect of contingent and unliquidated claims as to which no claim has been made prior to the Closing Date. If, subsequent to the Closing Date, valid claims are made on any contingent and unliquidated claim specified in Schedule 2, the Holders of such claims will receive a pro rata distribution of the New Bonds.

(Term Sheet at 3 n.5.)

On or about August 9, 2018, GDB began soliciting votes for a proposed qualifying modification for GDB. (See Kaminetzky Ex. A (the "Solicitation Statement").) The Solicitation Statement warned recipients that its information was only current as of the date it was issued, and that it would only be updated and supplemented to avoid material misstatements and material omissions through September 12, 2018. (Solicitation Statement at 3.) Consistent with footnote 5 of the Term Sheet, the Solicitation Statement represented that "no New Bonds will be issued in respect of contingent and unliquidated claims until valid claims are made on account of such contingent and unliquidated obligations, whether on or after the Closing Date." (Solicitation Statement at 14, 30.) However, the Solicitation Statement disclosed to recipients

that the terms of the indenture governing the bonds to be issued by the GDB Debt Recovery Authority would "be agreed upon by the Indenture Trustee and the Issuer, subject to approval by the Requisite Bondholders."  (Solicitation Statement at E-138.)

The Solicitation Statement directed readers to an exhibit summarizing claims against GDB for more information concerning the contingent claims.  (See Solicitation Statement at 14 & Ex. C.)  That exhibit provided a claim amount of $86,710,112 on account of the Stand-By LOCs, which it described as "the estimated potential amount of the contingent and unliquidated claim against GDB (discounted to reflect the likelihood thereof) with respect to the Stand-by LOC for which Additional Bonds may be issued (at a 55% exchange ratio) under the Bond Indenture."  (Solicitation Statement at Ex. C n.2.)

On August 10, 2018, GDB and AAFAF commenced a proceeding requesting judicial approval of a qualifying modification for GDB under Title VI of PROMESA.  On November 3, 2018, counsel to AAFAF filed draft versions of the definitive documents governing the proposed qualifying modification, including a draft master transfer agreement and a draft bond indenture.  (Docket Entry No. 252 in Case No. 18-1561.)  Those drafts each stated that the GDB Debt Recovery Authority would be obligated to issue bonds on account of the Stand-By LOCs at the direction of AAFAF or GDB and in the amounts instructed by AAFAF or GDB (up to a maximum aggregate amount that was not included in the drafts), with no mention of a requirement that there be "valid claims" on account of those contingent liabilities, notwithstanding the "valid claim" condition described in the Term Sheet and Solicitation Statement.

The Court entered an order approving GDB's qualifying modification on November 7, 2018.  The transaction approved by the Court entitled holders of certain claims

against GDB to receive a share of bonds issued by the GDB Debt Recovery Authority, a statutory public trust and a governmental instrumentality established by the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act No. 109-2017 (as amended, the "GDB Restructuring Act"). (DRA Parties' Br. at 11.) On or about November 29, 2018, the GDB Debt Recovery Authority and the other parties to the Master Transfer Agreement and the Bond Indenture executed those documents. (See Kaminetzky Ex. C (the "Master Transfer Agreement"); Kaminetzky Ex. K (the "Bond Indenture").) Neither contained a "valid claim" condition to the authority of AAFAF or GDB to direct the GDB Debt Recovery Authority to issue bonds on account of the Stand-By LOCs. Section 25 of the Master Transfer Agreement provided that it, along with the other "Transaction Documents,"[4] constituted the "full and entire understanding and agreement of the Parties" to the exclusion of other agreements, undertakings, representations, and statements. (Master Transfer Agreement § 25.)

On October 28, 2022, the Oversight Board commenced a Title VI proceeding for PFC. The proposed terms of the PFC Title VI transaction included two forms of consideration to be distributed to holders of certain bonds issued by PFC: The Commonwealth and PFC would contribute $13,800,000 in cash, and AAFAF and GDB would instruct the GDB Debt Recovery Authority to issue bonds in the original principal amount of $47,690,561.60 based upon section 2(b) of the Master Transfer Agreement and section 2.13 of the Bond Indenture. On December 1,

---

[4]     The definition of Transaction Documents is incorporated into the Master Transfer Agreement by reference to the Bond Indenture. See Master Transfer Agreement at 1 n.1 ("Capitalized terms used herein but not otherwise defined herein or in Schedule 1 have the shall have the meanings ascribed to them in that certain bond indenture, dated as of the date hereof . . . ."); Bond Indenture at 14 ("'Transaction Documents' means, collectively, this Indenture, the Bonds, the Transfer Agreement, the Servicing Agreement, the Keepwell Agreement, the Disclosure Agreement, the Collateral Monitor Agreement and the Collateral Monitor Fee Letter.").

2022, the Court so-ordered the Stipulation, bifurcating consideration of the application for approval of PFC's qualifying modification and the dispute concerning the Proposed Bond Issuance.  On December 30, 2022, the Court entered its order approving PFC's qualifying modification.  (See *Findings of Fact, Conclusions of Law, and Order Approving Qualifying Modification for the Puerto Rico Public Finance Corporation Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act*, Docket Entry No. 78 (the "PFC Approval Order").)  The PFC Approval Order provided that the issue of "[w]hether the DRA Bonds, if any, may be issued pursuant to the applicable documents and the Qualifying Modification, including whether any such DRA Bonds may be lawfully and validly issued . . . shall be determined by the Court in accordance with the" Stipulation.  (PFC Approval Order ¶ 51.)

II.

DISCUSSION

The present controversy comes to the Court as part of the Oversight Board's Application for approval of the PFC Qualifying Modification, of which the Proposed Bond Issuance is a part.  (See Application ¶ 3 (stating that a portion of the consideration, "subject to and as provided pursuant to the [PFC] Qualifying Modification, will be in the form of bonds issued by the GDB Debt Recovery Authority").)  Through the Application (and the agreed bifurcation of the Court's consideration of the Proposed Bond Issuance from the other aspects of the Application), the Oversight Board requests entry of an order approving the Proposed Bond Issuance, and the Court is therefore obligated to determine whether the Proposed Bond Issuance is authorized by applicable law.  Cf. Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 25 (1st

Cir. 2006) (noting that, even where a motion for summary judgment is unopposed, a district

court is "still obliged to consider the motion on its merits, in light of the record as constituted, in

order to determine whether judgment would be legally appropriate" (quoting Mullen v. St. Paul

Fire and Marine Ins. Co., 972 F.2d 446, 452 (1st Cir. 1992))); Nunez v. Nunez (In re Nunez),

196 B.R. 150, 156 (B.A.P. 9th Cir. 1996) ("The granting of an uncontested motion is not an

empty exercise but requires that the court find merit to the motion."); In re Young Broad. Inc.,

430 B.R. 99, 139 (Bankr. S.D.N.Y. 2010) ("The Court need not reach the issues of waiver and

standing because it has an independent duty to ensure that the requirements of 11 U.S.C. § 1129

are satisfied, even if no objections to confirmation have been made.").

           Pursuant to the Stipulation, the parties have asked the Court to determine whether

"there is [any] genuine dispute as to any material fact and [whether] the DRA Bond Issue may be

determined as a matter of law based upon the applicable documents."[5]  (Stipulation ¶ 5; see also

Stipulation ¶ 6 (stating that the parties will be permitted to engage in discovery "[i]n the event

the Court determines that the DRA Bond Issue cannot be decided without any discovery and as a

matter of law based upon the applicable documents").)  The Court therefore addresses the instant

dispute as if the parties have submitted cross-motions for summary judgment[6] under Rule 56 of

---

[5]      The "DRA Bond Issue" is defined in the Stipulation to be "whether the [Additional] DRA
Bonds may be issued pursuant to the applicable documents and as contemplated by the
[PFC] Qualifying Modification."  (Stipulation ¶ I.)

[6]      The DRA Parties' Brief contends that the Court should address the instant dispute as if
"the Government Parties stand in the shoes of a proponent of a summary judgment
motion under Rule 56" (DRA Parties' Br. at 17), but it simultaneously asks the Court to
make factual and legal determinations consistent with the DRA Parties' positions and,
presumably, render judgment in favor of the DRA Parties accordingly.  (See DRA
Parties' Br. at 33 (requesting that the Court "determine that the Additional DRA Bonds
may not lawfully be issued until a valid claim is made under the Stand-by LOCs" and
"determine that no valid claim has been made, or permit the parties to proceed to
discovery on that issue").  In any event, regardless of whether the DRA Parties' Brief is
construed as an objection to a motion for summary judgment or a cross-motion for

the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

Material facts are those that "possess[] the capacity to sway the outcome of the litigation under the applicable law," and there is a genuine factual dispute where an issue "may reasonably be resolved in favor of either party." Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (internal quotation marks and citations omitted).  The Court must "review the material presented in the light most favorable to the non-movant, and . . . must indulge all inferences favorable to that party." Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990) (internal quotation marks and citations omitted).  When a properly supported motion for summary judgment is made, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)).  The non-moving party can avoid summary judgment only by providing properly supported evidence of disputed material facts.  See LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993).

1.  Standing

As a threshold issue, the Court first addresses whether the DRA Parties have standing to prosecute their objection to the Proposed Bond Issuance.  Cf. In re Glob. Indus. Techs., Inc., 645 F.3d 201, 210 (3d Cir. 2011) ("To object to the confirmation of a reorganization plan in bankruptcy court, a party must, in the first instance, meet the requirements for standing

---

summary judgment, the Court grants summary judgment in favor of the proponents of the Proposed Bond Issuance for the reasons set forth herein.

that litigants in all federal cases face under Article III of the Constitution."); Assured Guaranty

Corp. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 872

F.3d 57, 64 n.7 (1st Cir. 2017).  To demonstrate constitutional standing, a litigant must have (1)

suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant,

and (3) that is likely to be redressed by a favorable judicial decision.  Spokeo, Inc. v. Robins, 578

U.S. 330, 338 (2016).  These requirements ensure that each party has a "legally protected interest

that could be affected by a bankruptcy proceeding."  In re Glob. Indus. Techs., Inc., 645 F.3d at

210 (quoting In re James Wilson Assocs., 965 F.2d 160, 169 (7th Cir. 1992)); see Gustavsen v.

Alcon Lab'ys, Inc., 903 F.3d 1, 7 (1st Cir. 2018) ("A constitutionally sufficient injury arises

from an 'invasion of a legally protected interest' that is both 'concrete and particularized' as well

as 'actual or imminent,' rather than 'conjectural or hypothetical.'") (quoting Lujan v. Defs. of

Wildlife, 504 U.S. 555, 560 (1992)).  A generalized interest in having the government or others

act in a lawful manner is not sufficient to confer standing.  Indeed, "[i]t is apodictic that a mere

interest in seeing the government turn square corners is not the kind of particularized interest that

can satisfy the most basic constitutional prerequisite for standing."  Osediacz v. City of Cranston,

414 F.3d 136, 142 (1st Cir. 2005); Daggett v. Comm'n on Governmental Ethics & Election

Pracs., 172 F.3d 104, 110 (1st Cir. 1999).

       The crux of the Supporting Parties' argument concerning standing is that the DRA

Parties' "rights and powers" (as set forth in the operative agreements governing their duties) "do

not include interfering in the issuance of Additional DRA Bonds, an action that bears no relation

whatsoever to their actual duties or authority."  (Fir Tree Br. ¶ 47; see also U.S. Bank Br. at 2-4

(arguing that the relevant agreements "make it clear that the DRA Parties' rights and duties are

directed to the procurement and management of assets that will provide funds for the payment of

DRA bonds" and "not the issuance of the DRA bonds").)  More generally, certain of the

Supporting Parties contend that the agreements to which the Servicer and Collateral Monitor are

parties merely "task the DRA Collateral Parties with taking action to enforce rights regarding

and collect proceeds from the Restructuring Property, and monitoring and reporting on such

actions."  (Fir Tree Br. ¶ 49.)

   If the GDB Debt Recovery Authority had chosen to participate in the instant

litigation, its interests would have satisfied the requirements for Article III standing.  If the Court

approves the Proposed Bond Issuance and recognizes that AAFAF and GDB have authority to

direct the GDB Debt Recovery Authority to issue the Additional DRA Bonds, the GDB Debt

Recovery Authority would be compelled to issue millions of dollars of additional securities that

it would be contractually obligated to repay.  That is an Article III injury that is directly traceable

to the Proposed Bond Issuance, and it is redressable because it would be avoided if the Court

were to determine that the Proposed Bond Issuance is unlawful (in whole or in part) for any of

the reasons advanced by the DRA Parties.

   Although the GDB Debt Recovery Authority would have standing to object, it has

not done so,[7] so the Court must determine whether the GDB Debt Recovery Authority has

---

[7] At the Hearing, counsel to the GDB Debt Recovery Authority voiced support for the
Servicer's positions.  (May 10, 2023, Hr'g Tr. 6:3-11.)  The GDB Debt Recovery
Authority did not, however, file a timely objection to the Proposed Bond Issuance nor
seek leave to file a late response.  A party that does not have Article III standing cannot
"piggyback" on the standing of a non-party that would have standing but chooses not to
participate in litigation.  See Diamond v. Charles, 476 U.S. 54, 61, 63-64 (1986) (holding
that the state of Illinois' letter to the Court averring that its "interest in this proceeding is
identical to that advanced by it in the lower courts and is essentially co-terminus with
the position on the issues set forth by the appellants" was insufficient to permit the
appellant to "'piggyback' on [Illinois'] undoubted standing").  The GDB Debt Recovery
Authority's informal statement of its position therefore does not obviate the Court's
obligation to address the DRA Parties' standing in this proceeding.

delegated authority to either of the DRA Parties to litigate on its behalf.  See Vitoria Telecom,

LLC v. MET One LLC, No. 1:21-CV-20832-PCH, 2021 WL 10257113, at *2 (S.D. Fla. May 17,

2021) ("The Co-Lender Agreement appoints Vitoria as the Collateral Agent for all Lenders and

authorizes the Collateral Agent to exercise powers granted to the Lenders under the Pledge

Agreement and note agreements. . . . Vitoria has standing to bring this suit by virtue of the Co-

Lender Agreement."); cf. Thole v. U. S. Bank N.A., 140 S. Ct. 1615, 1620 (2020) (holding that

ERISA plan participants lacked standing where they had "not been legally or contractually

appointed to represent the plan").  Here, the Servicer was engaged by the GDB Debt Recovery

Authority pursuant to the Servicing Agreement, section 1.02(b) of which obligates the Servicer

to, among other things, "us[e] commercially reasonable efforts to enforce the [GDB Debt

Recovery Authority]'s rights under the Transfer Agreement."  (Behlmann Ex. A (the "Servicing

Agreement").)  The Master Transfer Agreement similarly provides that the GDB Debt Recovery

Authority "appoints the Servicer as its agent with respect to all rights and obligations under this

Agreement."  (Master Transfer Agreement § 26.)  The Master Transfer Agreement, in turn, is

also a primary source of authority relied upon by the Supporting Parties for the Proposed Bond

Issuance.  (See, e.g., Gov't Parties' Br. at 23 ("GDB . . . has a direct right under the Master

Transfer Agreement to enforce the issuance of the Additional Bonds under the Indenture.").)

The Supporting Parties contend that the Master Transfer Agreement—to which the GDB Debt

Recovery Authority is a party—obligates the GDB Debt Recovery Authority to issue the

Additional DRA Bonds upon its receipt of instructions from GDB or AAFAF and without any

other conditions relevant to the instant dispute.  The DRA Parties, in objecting to the Proposed

Bond Issuance based upon their contention that the authority granted to GDB and AAFAF to

compel the issuance of "Additional Bonds" does not apply in the present circumstances because

"additional bonds may be issued by the DRA on account of the contingent Stand-by LOC claims only if and to the extent the contingency has actually occurred giving rise to a _valid_ claim," are carrying out the Servicer's obligation to enforce the GDB Debt Recovery Authority's rights under the Master Transfer Agreement.  (See DRA Parties' Br. at 6-7, 22-25 (arguing that the Supporting Parties' position "ignores the qualifications on the right to direct the issuance of Additional DRA Bonds under the Master Transfer Agreement, which governs the contractual obligations between the DRA and GDB").)

Accordingly, the DRA Parties have standing to prosecute their objection to the Proposed Bond Issuance,[8] and the Court will next turn to the merits of the dispute.

### 2.   The DRA Bond Issue

The parties' dispute principally concerns the provisions of the Solicitation Statement and the GDB RSA Term Sheet stating that Additional DRA Bonds would not be issued until valid claims are made with respect to contingent and unliquidated claims (the "Valid Claim Requirement").  (See Solicitation Statement at 14, 30 ("[N]o New Bonds will be issued in respect of contingent and unliquidated claims, until valid claims are made on [such claims]."); see also Term Sheet at 3 n.5.)  The crux of the parties' dispute is whether the Valid Claim Requirement survived the execution of certain definitive documents governing GDB's qualifying modification—in particular the Master Transfer Agreement and the Bond Indenture—or whether

---

[8]      Having determined that the Servicer has standing, the Court need not address the Collateral Monitor's standing to present identical arguments.  See Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1282 (1st Cir. 1996) ("[T]he court need not determine the standing of all plaintiffs if at least one plaintiff has standing to maintain each claim."); see also Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 183 (1st Cir. 1999) ("[W]hen one of several co-parties (all of whom make similar arguments) has standing, an appellate court need not verify the independent standing of the others.").

the issuance of Additional DRA Bonds is governed solely by those documents (neither of which contains a Valid Claim Requirement).

Notwithstanding the inclusion of the Valid Claim Requirement in the Solicitation Statement and Term Sheet, the Court concludes, in light of the express provisional language in those documents, that the terms of the Master Transfer Agreement and Bond Indenture govern, and the Valid Claim Requirement is not an enforceable provision of any agreement governing the Proposed Bond Issuance.

To begin with, the Court's order approving GDB's qualifying modification approved "[t]he Qualifying Modification, including the Exchange Terms," determining GDB's qualifying modification to be "approved and binding in its entirety." (Kaminetzky Ex. B ¶ 29 (the "GDB Approval Order").) The "Exchange Terms" are defined as the "exchange" described in paragraph 13 of the Approval Order "pursuant to the terms more particularly set forth in the [GDB] RSA and described in the Solicitation Statement." (Approval Order ¶ 13.) The Approval Order further provides that GDB's qualifying modification "is subject to and conditioned upon the consummation of the other components of the global restructuring of GDB's outstanding liabilities pursuant to the GDB Restructuring Act . . . including, among others, the execution and delivery of all definitive documents . . . in form and substance satisfactory to GDB and the RSA Requisite Bondholders (as defined in the RSA)." (Approval Order ¶ 14.)

The DRA Parties focus principally on paragraph 13 of the Approval Order, but paragraph 14 of the Approval Order and an examination of the GDB RSA and the Solicitation Statement make clear that the definitive terms of the GDB's qualifying modification ultimately are those set forth in in the definitive documents governing the transaction, rather than the terms described in the Solicitation Statement and the Term Sheet.

Although the RSA Term Sheet describes the Valid Claim Requirement in a footnote cited by the DRA Parties, the GDB RSA provides that the "RSA shall automatically be deemed amended to replace the Restructuring Term Sheet with the Definitive Documents as Exhibit A hereto and all references in this Agreement to the Restructuring Term Sheet shall be deemed to be references to the Definitive Documents, as applicable." (GDB RSA § 7.) "Definitive Documents" are defined in the GDB RSA to include "the documents (including any related agreements, instruments, schedules, or exhibits) that are necessary or desirable to implement, or otherwise relate to, the Restructuring." (GDB RSA § 1(c).) Thus, upon the execution of the definitive documents, the terms of the Bond Indenture and the Master Transfer Agreement replaced those in the Term Sheet, and the terms of the Definitive Documents (including the Master Transfer Agreement's Entire Agreement clause) governed the parties' relationship.[9] (See Master Transfer Agreement § 25 (providing that "[a]ll prior negotiations, agreements, representations, warranties, statements and undertakings concerning the subject matter hereof between the Parties are superseded by the foregoing").) Consistent with that state of affairs, the Term Sheet provides that it is "subject to the terms and conditions hereof, including, without limitation, requisite approvals under Title VI of PROMESA and execution and delivery of definitive agreements." (RSA at Ex. A.) Furthermore, the Term Sheet contains a covenant requiring the GDB Debt Recovery Authority to "comply in all material respects with its obligations under the Definitive Documents, including the transfer agreement." (RSA at Ex. A.)

Similarly, although the Solicitation Statement included a description of the Valid

---

[9]     Although the definition of Definitive Documents in the GDB RSA stated that such documents were to be "in each case on terms and conditions consistent with the Restructuring Term Sheet" (GDB RSA § 1(c)), the reference to the Term Sheet was automatically deemed to be a reference to the relevant Definitive Documents upon the execution of the definitive agreements. (See GDB RSA § 7.)

Claim Requirement, the Solicitation Statement also disclosed that its terms would be subject to later definitive documentation.  The Solicitation Statement provided that the information that it contained was subject to change and that it would only be updated as to material facts up to the date of the voting deadline for the GDB Qualifying Modification.  (Solicitation Statement at 3.) Furthermore, the Solicitation Statement cautioned bondholders that the DRA bonds ultimately were to be governed by the Bond Indenture, "to be agreed upon by the Indenture Trustee and the Issuer, subject to approval by the Requisite Bondholders" (Solicitation Statement at E-138), it warned voting bondholders that the issuance of Additional DRA Bonds in connection with the GDB Stand-by Letters of Credit "may dilute the value of the then-existing New Bonds" (Solicitation Statement at E-36), and it disclosed an "estimated potential" claim in the amount of $86.7 million, "discounted to reflect the likelihood" of the contingency.  (Solicitation Statement at C-2 n.2.)

The references to the "[GDB] Qualifying Modification" in the provisions of the GDB Restructuring Act, the Bond Indenture, and the Master Transfer Agreement quoted by the DRA Parties do not provide any basis to read the Valid Claim Requirement from the Term Sheet or the Solicitation Statement into the Definitive Documents.  The GDB Restructuring Act authorizes the issuance of bonds pursuant to the "Qualifying Modification," which it defines to be the "Restructuring Support Agreement dated May 17, 2017 and certified by the Oversight Board as a Qualifying Modification under Section 601(g)(2)(A) of PROMESA, *as the same may be amended from time to time in accordance with its terms*."  7 L.P.R.A. § 3163(ii) (emphasis added).  It therefore expressly contemplates and incorporates modifications to the overall qualifying modification and does not bar the GDB RSA's automatic substitution of the Definitive Documents for the Term Sheet.  Moreover, the GDB Restructuring Act also

authorizes further issuances of bonds pursuant to "ancillary agreements," a term which is defined to include (among other things) the "bond indenture" and the "transfer agreement." 7 L.P.R.A. § 3163(c).

The references to "the terms of the Qualifying Modification" in the Bond Indenture and Master Transfer Agreement similarly effectively incorporate the terms of the definitive governing documents. Those agreements define the "Qualifying Modification" broadly as the "[r]estructuring . . . being effectuated through a qualifying modification . . . under Title VI of [PROMESA] . . . as well pursuant to the GDB Restructuring Act" (Bond Indenture at 1; see Master Transfer Agreement at 1 n.1), thereby encompassing the transaction that arose out of the GDB Restructuring Act and the GDB RSA, whose terms were ultimately documented in the definitive documents which unambiguously permit the Proposed Bond Issuance.

For its part, the Court entered the Approval Order based upon its review of the terms of GDB's qualifying modification, which included the terms, described above, that permitted the parties to negotiate the definitive terms of the transaction subject to the approval and execution of the definitive documents. No party objected to the terms of the transaction that permitted such modifications (in fact, certain GDB creditors had approval rights over the definitive documents, and the GDB Debt Recovery Authority ultimately executed both the Master Transfer Agreement and the Bond Indenture), and such changes were contemplated by the GDB Restructuring Act and not foreclosed by the Solicitation Statement and the GDB RSA.

Accordingly, the DRA Parties' objection to the Proposed Bond Issuance is overruled, and the Court finds that the Proposed Bond Issuance is permitted under the governing law and relevant documents.

III.

C<small>ONCLUSION</small>

For the foregoing reasons, the parties are directed to meet and confer and, by **5:00 p.m. (Atlantic Standard Time)** on **August 28, 2023**, submit an agreed proposed order (or a joint status report setting forth the parties' respective proposals for such an order) approving the Proposed Bond Issuance.


SO ORDERED.

Dated:  August 14, 2023

 /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge